UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MARCHE L. HARRISON,

            Petitioner,

     v.

ERIC ARNOLD, Warden,

            Respondent.

Case No.  14-cv-01121-JST (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by petitioner Marche Harrison, challenging the validity of a judgment obtained against him in state court.  Respondent filed an answer to the petition.  Petitioner has filed a traverse and a supplemental traverse.  For the reasons set forth below, the petition is denied.[1]

## I.  PROCEDURAL HISTORY

On March 28, 2011, an Alameda County jury found petitioner guilty of residential burglary, residential robbery, forcible rape while acting in concert, forcible oral copulation while acting in concert, and possession of a firearm by someone previously convicted of a felony.  The trial court found petitioner had two prior strike convictions.  On June 24, 2011, petitioner was sentenced to 107 years to life in state prison.  The California Court of Appeal affirmed, and the California Supreme Court denied review.  Petitioner did not seek habeas relief in state court.  The instant action was filed on March 10, 2014.

---

[1] Petitioner named Gary Swarthout, former warden of California State Prison, Solano—where petitioner is incarcerated—as the respondent in this action.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Eric Arnold, the current warden of California State Prison, Solano, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian.

United States District Court
Northern District of California

1

## II.  STATEMENT OF FACTS

2

The following background facts describing the crime and evidence presented at trial are

3

from the opinion of the California Court of Appeal:[2]

4

There was evidence at trial of the following facts.  Jane Doe lived in Union City with

5

her husband, Charles, and their two daughters, Angela age 22 and Erica age 16.
Charles was a marijuana dealer.  On the morning of December 28, 2004, Jane and her

6

daughters were home but Charles was away.  Around 10:30 a.m., the doorbell rang
and Angela opened the front door to two men with a dolly and large cardboard

7

moving box.  One of the men, later identified as [petitioner], was holding a white
binder.  He asked Angela if Charles lived there and when she answered affirmatively

8

the men entered the house.

9

[Petitioner] pointed a gun at Angela and asked "Where's the safe?"  Angela said she

10

did not know what he was talking about and [petitioner] asked if anyone else was
home.  Angela said her mother and sister were home.  [Petitioner] and the other man,

11

both armed, forced Angela to take them to the bedroom of her mother, Jane Doe.  As
[petitioner] held Angela, with a gun pointed at her, the other man grabbed Jane by the

12

arm and "yank[ed]" her from bed.  The two men took Jane and Angela to the bedroom
where Erica was sleeping and [petitioner]'s accomplice pulled the young woman from

13

bed, saying "This ain't no dream."

14

The men moved the women into the living room and ordered them to strip.  The

15

women removed everything but their panties.  The men forced Jane to duct tape each
daughters' ankles and wrists together, and tape shut their mouths.  [Petitioner] told his

16

accomplice to shoot the bound women if his questions were not answered and
demanded that Jane tell him where the security system control was located.  When

17

shown the system in the hall closet, [petitioner] tore it apart, threw it into the bathtub and
ran water over it.  [Petitioner] then pulled Jane into the garage where the safe was

18

located and demanded that she open the safe.  After it was opened, [petitioner] ordered
Jane back to the living room and returned to the garage where he emptied the safe of

19

a Rolex watch, jewelry and other items.

20

[Petitioner] then took Jane with him as he went through the house "ransacking

21

everything."  In Jane's bedroom, [petitioner] grabbed her buttocks and said "I want a
piece of that."  [Petitioner] asked if there were condoms in the bedroom and when Jane

22

said there were not, [petitioner] went through the house looking for condoms.  Finding
none, [petitioner] took a plastic bag from a kitchen cabinet and forced Jane back to the

23

bedroom.

24

[Petitioner], still armed, ordered Jane to take off her panties and lie on the bed.

25

[Petitioner] forced open her legs, orally copulated her, then put the plastic bag over his
penis and "forced his penis into [her] vagina."  He ejaculated into the plastic bag.

26

27

---

[2] This summary is presumed correct.  Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir.

28

2002); 28 U.S.C. § 2254(e)(1).

United States District Court
Northern District of California

[Petitioner] then brought Jane to the living room where he told his accomplice that it was "his turn." The accomplice pulled Jane back to the bedroom and forced her to orally copulate him. He then took Jane to the living room, tied her, and the men went through the house looking for drugs and cash. The men took the women's identification cards and cell phones. As they were leaving, [petitioner] told the women he would kill them if they called the police and that he would know if they called because he had an "inside guy" with the police.

As soon as the men left, Jane untied herself but within a minute or two [petitioner] returned alone, retied Jane, and briefly went into the kitchen and down the hallway to the bedroom. Jane testified that "[i]t sounded like he was looking for something in the master bedroom." [Petitioner] then left again. Jane waited a few minutes to be sure he was gone and then untied herself and her daughters.

[Petitioner]'s death threats made Jane afraid to immediately call the police. She telephoned her husband, friends came to comfort her, and she began to clean the house. One of the friends convinced her to call the police and she did so several hours after the robbers left. The police arrived and saw that the garage had been "ransacked." They found a plastic bag containing semen in the hall closet. A white binder matching the description of the binder [petitioner] had when he arrived at the house was found on the kitchen table. An invoice inside the binder bore [petitioner]'s fingerprints.

Following the identification of [petitioner]'s fingerprints, the police prepared a six person photo line-up from which Jane positively identified [petitioner] as the man who raped and robbed her. The police obtained a search warrant and searched an Oakland residence where they recovered jewelry and other items taken from Jane's residence, a fully loaded revolver, and a photograph of [petitioner] holding a revolver and mail bearing [petitioner]'s name and address.

Shortly afterwards, a criminal complaint against [petitioner] was filed and a warrant was issued for [petitioner]'s arrest. However, [petitioner] was not apprehended until December 2008, almost four years after the charges were filed. Following [petitioner]'s arrest, a criminalist found that [petitioner]'s DNA profile matched the semen contained in the plastic bag recovered from Jane's house. The plastic bag also had material on the exterior surface, which the criminalist determined to be a mixture of Jane's epithelial cells and sperm cells from her husband. The criminalist testified that the surface of an object put inside a female vagina can receive a transfer of preexisting sperm from within the vagina.

Ex. 12 at 2-4.[3]

---

[3] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer, unless otherwise indicated.

**III. DISCUSSION**

A.     Standard of Review

        This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

        A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Penry v. Johnson, 532 U.S. 782, 795 (2001) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).

        A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Williams, 529 U.S. at 405-06.  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id. at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

        Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the

4

United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412 (internal quotation marks omitted). "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

Here, as noted, the California Supreme Court summarily denied petitioner's petition for review. The Court of Appeal, in its opinion on direct review, addressed all three of the claims petitioner raises in the instant petition. The Court of Appeal thus was the highest court to have reviewed the claims in a reasoned decision, and, as to all claims, it is the Court of Appeal's decision that this Court reviews herein. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

B.      Petitioner's Claims

Petitioner asserts the following grounds for relief: (1) The prosecution withheld a potentially exculpatory document showing that the Oakland Police Department had closed the case against petitioner more than two years prior to his arrest. (2) The prosecution failed to correct the false testimony of Oakland police officer Bergquist stating that the Oakland Police Department had maintained an open file against petitioner. (3) The trial court erred in replacing a deliberating juror with an alternate juror. The Court addresses these claims in turn.

1.      Exculpatory Evidence

Petitioner claims that the prosecution withheld a potentially exculpatory document showing that the Oakland Police Department had closed the case against petitioner more than two years prior to his arrest.  Dkt. #3 at 6, Dkt #3-2 at 22-38.[4]  The background for this claim arises in connection with petitioner's claim on direct appeal that the lapse of time between the filing of the complaint and his arrest violated his right to a speedy trial.[5]  Prior to trial, petitioner moved to

_____

[4] The page numbers refer to those affixed to the top of the page by the court's electronic filing program.

[5] The federal right to a speedy trial attaches only after the defendant has been arrested or formally charged by indictment or information. United States v. MacDonald, 456 U.S. 1, 6 (1982); United States v. Marion, 404 U.S. 307, 320 (1971).  Consequently, the state court determined that only

United States District Court
Northern District of California

United States District Court
Northern District of California

1  dismiss the charges on these grounds.  The Court of Appeal summarized the evidence presented at

2  the proceedings on the motion to dismiss as follows:

3  In support of his motion, [petitioner] submitted declarations stating that he "was
   completely unaware of the charges pending against [him] in the present case" before
4  his arrest in December 2008 and had been "living openly in Oakland" and could have
   been arrested sooner "had the authorities made reasonable efforts to do so."
5  [Petitioner] declared that he had "no recollection" of his whereabouts on the date of
   the crimes or "who, if anyone, [he] may have been with" on that date.  He also stated
6  that a woman named Lynne Nichols, who died in early 2008, had been "personally
   present with [him] when [he] was in the company of [the] complaining witness Jane
7  Doe" prior to the date of the crimes and therefore could have impeached Jane's
8  statement that "the perpetrators had no prior associations to her or her family."

9  As justification for the delay, the prosecution offered the testimony of two police
   officers who said that an arrest warrant was timely issued when the complaint was
10  filed on February 25, 2005, and that efforts to apprehend [petitioner] were unsuccessful
   until [petitioner] was identified during a traffic stop on December 31, 2008.  The
11  investigating officer testified that an earlier search of [petitioner]'s Oakland residence
   in early February 2005 failed to locate him and a search of computer databases failed
12  to provide another address.  Union City police sought the assistance of an Oakland
   police officer with the "Sexual Assault Felony Enforcement" (SAFE) task force
13  because [petitioner]'s contacts and last-known residence were in Oakland.[6]  The Union
   City Police Department prepared a wanted flyer with [petitioner]'s photograph and
14  identifying information and distributed it to its officers and to SAFE.
15

16  Oakland Police Officer Timothy Bergquist of SAFE testified that he spent several
   years trying to locate [petitioner].  Bergquist said a "Be on the Lookout" (BOL) flyer
17  with [petitioner]'s photograph and identifying information was periodically distributed
   to the Oakland Police Department and federal and Bay Area public agencies.  BOL
18  pocket-sized cards were distributed to field officers.  Bergquist testified that he also ran a
   computer database search "typically once a month" to check for any updated
19  addresses from driver's license information and other sources but failed to locate
20  [petitioner].

21  Ex. 12 at 5-6 (footnote in original).

22  On January 31, 2011, the trial court denied petitioner's motion to dismiss.  Ex. 3 at 304.

23  On June 24, 2011, after the jury rendered its verdict but before imposition of sentence, defense

24  counsel notified the trial court that he had recently received from the prosecution a packet of

25  _____

26  the state speedy trial right was at issue in the present case. Ex. 12 at 5 n.3.  Petitioner does not
   challenge this conclusion.

27  [6] SAFE is a task force composed of federal, state and local law enforcement agencies
28  that tracks and monitors sex offenders.  Its duties include warrant service.

1    materials consisting of the entire SAFE task force file relating to petitioner.  Ex. 3 at 1659-60.

2    Included in the packet was a document with a May 23, 2006 entry with the notation "Case closed.

3    UTL warrants."  Petition at Dkt. #3-6 at 2.  Above that entry, and entered on the same date, are the

4    following notations: "Sent new TRAK flyer to CA and NV" and "Sent warrant info to US

5    Marshals."  Id.

6            The trial court found that the document did not undermine Officer Bergquist's testimony.

7    Defense counsel conceded that Officer Bergquist testified at the original hearing that he resent

8    flyers relating to petitioner on May 7, August 7 and December 31, 2007 and that those flyers were

9    introduced as exhibits in the court record.  Ex. 3 at 1661.  The trial court described the flyers that

10   were resent in 2007.  Ex. 3 at 1664.  The court noted that Officer Bergquist had testified that he

11   reviewed the file periodically and that the file was considered open until the suspect was in

12   custody or had died.  The court stated that the SAFE task force practice was to review each case

13   on a monthly basis to determine if any activity, such as a ticket, citation, or arrest, had occurred.

14   Ex. 3 at 1664, see Ex. 3 at 83-84.  Based on the exhibits and testimony, the court stated it did "not

15   find any changed circumstance or significant or substantial information contained in Defense

16   Exhibit A that would change the Court's ruling or thought process in how to evaluate whether or

17   not there was a speedy trial violation."  Ex. 3 at 1665.  The court stated that it reconsidered

18   petitioner's motion to dismiss and, having reconsidered, would deny the motion again.  Ex. 3 at

19   1665.  The Court of Appeal determined that "[s]ubstantial evidence fully supports the trial court's

20   finding that police efforts to locate [petitioner] continued from the time he was identified as a

21   suspect until his apprehension."  Ex. 12 at 7 (footnote omitted).

22           The Court of Appeal addressed petitioner's current claim in a footnote:

23      [Petitioner] also contends that the prosecutor was required to produce the SAFE file
        earlier in the proceedings. (*People v. Brady* [sic] (1963) 373 U.S. 83.)  Assuming,
24      without deciding, that he is correct in this respect, the file nonetheless was produced
        in time to be brought to the court's attention in support of [petitioner]'s request to
25      dismiss the action.  The court considered the significance of the document on the
        merits (as do we) and justifiably found that it did not alter its conclusion.  Hence, it is
26      clear that earlier production of the file would not have affected the disposition of the
        motion. (Cf. *People v. Clark* (2011) 52 Cal.4th 856, 981-982.)
27

28   Ex. 12 at 7 n.6.

                                                      7

In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Id</u>. at 87.  In order to succeed on a <u>Brady</u> claim, a petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material (or, put differently, that prejudice ensued).  <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004).   Evidence is material if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different."  <u>Cone v. Bell</u>, 556 U.S. 449, 469-70 (2009).

Here, the May 23, 2006 notation in the SAFE task force document was not exculpatory. The note had nothing to do with petitioner's guilt or innocence but related solely to police efforts to locate him between May 23, 2006 and his arrest in December of 2008.  Officer Bergquist did not testify at petitioner's trial.  Ex. 1 at 373-74; Ex. 2 at i-ii.  Thus, the document would not have impeached Officer Bergquist on an issue relevant to petitioner's guilt or innocence.  Moreover, petitioner fails to show the document would have been admissible at trial.  Information that is not admissible at trial "is not 'evidence' at all."  <u>Wood v. Bartholomew</u>, 516 U.S. 1, 6 (1995) (per curiam) (no <u>Brady</u> error where prosecutor did not disclose witnesses' polygraph results that were not admissible under state law for either substantive purposes or for impeachment).  Finally, the notation that the case was closed was by definition inaccurate given that petitioner was ultimately arrested and charged on the instant offenses.

In addition, petitioner cannot establish prejudice.  The trial court reconsidered and denied petitioner's speedy trial motion in light of the document.  The trial court found that the document did not include information that would change its ruling on the speedy trial violation.  This ruling was upheld by the Court of Appeal.  Because the note was neither favorable evidence nor impeachment evidence and because its delayed disclosure did not prejudice petitioner, the state court's determination was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

1    Accordingly, petitioner is not entitled to habeas relief on this claim.

2    2.    False Testimony

3    Petitioner claims the prosecutor committed misconduct by knowingly presenting false

4    testimony regarding Officer Bergquist's attempts to locate petitioner.  Dkt. #3 a 6, Dkt. #3-2 at 39-

5    54.

6    The government's knowing use of false or perjured testimony against a defendant to

7    obtain a conviction violates due process.  Napue v. Illinois, 360 U.S. 264, 269 (1959).  A

8    conviction obtained through the use of testimony which the prosecutor knows or should know is

9    perjured must be set aside if there is any reasonable likelihood that the testimony could have

10   affected the judgment of the jury.  See United States v. Agurs, 427 U.S. 97, 103 (1976).  The

11   result is the same when the prosecutor, although not soliciting false evidence, allows it to go

12   uncorrected when it appears.  See Napue, 360 U.S. at 269.  To prevail on a claim based on

13   Agurs/Napue, the petitioner must show that (1) the testimony (or evidence) was actually false,

14   (2) the prosecution knew or should have known that the testimony was actually false, and (3) the

15   false testimony was material.  See United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003).

16   In evaluating allegations of prosecutorial misconduct, this court considers whether the

17   prosecution's actions "so infected the trial with unfairness as to make the resulting conviction a

18   denial of due process."  See Hein v. Sullivan, 601 F.3d 897, 912 (9th Cir. 2010) (quotation marks

19   omitted).

20   The Court of Appeal addressed petitioner's current claim in a footnote:

21   [Petitioner] also asserts that the prosecutor knowingly used false evidence in presenting
     Bergquist's testimony of ongoing efforts to locate [petitioner].  (*Napue v. Illinois* (1959)
22   360 U.S. 264.)  As discussed above, Bergquist's testimony was corroborated by
     documentary evidence and was not compromised by the single notation in the SAFE file
23   upon which [petitioner] relies.

24   Ex. 12 at 7-8 n.6.

25   Officer Bergquist did not testify at petitioner's trial and thus could not have affected the

26   judgment of the jury.  Moreover, the notation in the SAFE file on which petitioner relies does not

27   demonstrate that Officer Bergquist's testimony, which was supported by evidence of the flyers

28   sent out on May 7, August 7 and December 31, 2007, was false.  Thus, the state court reasonably

United States District Court
Northern District of California

9

United States District Court
Northern District of California

1   determined that petitioner's conviction was not obtained in violation of due process based on

2   knowing presentation of false testimony by the government.

3          Petitioner further contends Officer Bergquist testified falsely when he testified that the

4   wanted poster created by Union City police officer Derting was created in March 1998, i.e., over

5   five years before the crimes occurred.  Dkt. #3-2 at 44-45; see Ex. 3 at 55, 74.  The parties

6   stipulated to the relevant dates for purposes of the motion to dismiss.  Ex. 3 at 44-45.  Thus it was

7   obvious at the hearing that the poster was not created before the crimes.  Moreover, Officer

8   Bergquist testified that some information from the flyer was provided by the CABS system, which

9   is an electronic database that includes a photograph and identifying information for every person

10  who has been booked for a crime in Alameda County.  Ex. 3 at 74.  Two exhibits attached to the

11  petition include petitioner's name and photographs with September 4, 2001 and May 3, 2003

12  booking dates and references to "CABS 02/98."  Dkt. #3-9 at 12-13.  It therefore appears that

13  Officer Bergquist's testimony was referring to a CABS date associated with a prior booking of

14  petitioner, not the date the flyers for the present offenses were created.  Consequently, petitioner

15  fails to establish that the testimony was either false or material.

16         Accordingly, petitioner is not entitled to habeas relief on this claim.

17         3.      Replacing Juror

18         Petitioner claims the trial court erred by removing Juror Number 9 and by failing to inquire

19  into alleged misconduct by other jurors.  Dkt. #3 at 6; Dkt. #3-2 at 55-77.  The Court of Appeal

20  summarized the background for this claim as follows:

21         Deliberations began on the afternoon of Tuesday March 15, 2011.  About two hours into
           deliberations the jury sent a note with questions and requests for materials, as follows:
22         "Was there any evidence of DNA swabs from mouth of Jane Doe?  [¶] Transcript and
           audio initial interviews w/ Jane Doe at hospital, 12/28/04; and initial interviews with
23         Angela and Erica Doe, at police station.  [¶] White binder from crime scene.  [¶] Color
           photo of revolver, in Oakland residence.  [¶] Transcript & audio of photo lineup session.
24         [¶] DNA typing lab results.  [¶] List of all prosecution and defense exhibit[ ]s."  The jury
           then recessed for the day.
25

26         The next day, Wednesday March 16, the court conferred with counsel and then called the
           jury into the courtroom to respond in detail to each item in the note.  Its response included
27         an explanation that there was no evidence introduced at trial about DNA testing of oral
           swabs from Jane Doe and no DNA laboratory results apart from the expert's testimony,
28

United States District Court
Northern District of California

which upon request would be read back to the jury.  The court also explained that only portions of the audiotape witness interviews and the photo lineup session with Erica had been introduced as evidence and that those recordings could also be re-played in the courtroom upon request.

The jury resumed deliberations for a few minutes, then sent a note requesting all available audio recordings, the "entire" reporter's transcript and a "[t]imeline of case development: dates of actions taken by detectives, crime labs, searches conducted, samples taken, etc." The court arranged to have the recordings played for the jury and explained that the entire reporter's transcript would not be read but that portions would be read if the jury had specific questions.  The court also explained that it could not create a timeline but that an individual juror was free to develop one from the juror's notes and recollection of the testimony.

Another note, previously typewritten at home by Juror No. 9, was presented to the court immediately after the morning recess on March 16.  The note read: "Access to the computer has become an essential part of daily life.  College students use laptops to take notes in class, sort through a multitude of concepts and ideas, do homework, draft papers, and revise papers.  The students also have access to printers.  [¶] It would be a serious handicap not to have access to the computer.  [¶] In sorting through the facts of this case, the jurors may also need the help of a computer, say, merely for word-processing: [¶]—to establish the timeline [¶]—to note which exhibit establishes what fact, or raises what questions [¶]—to track the consistency or inconsistency in the same witness' testimony [¶]—to track the consistency and inconsistency among different witnesses and documents [¶]—to put down, in writing, the ideas that have come to the juror's mind, so that the ideas can be scrutinized (by himself or herself individually at first) more closely and more objectively at a later time [¶]—in light of the whole record, after reviewing all of the evidence [¶]—to track the questions in one's mind [¶]—to figure out which elements of crimes have, or have not, been proven [¶]—to organize, rethink, and revise all of the above in an efficient manner [¶]—Will a computer for word-processing be made available to the jurors?  [¶] Will a LaserJet printer be made available to the jury?  [¶] Can a juror use his or her own at home, under the condition that no one else will have access to the computer throughout the trial?  [¶] Will a juror be permitted to bring his or her own LaserJet printer to the jury deliberation room?"

The court responded that a juror should not evaluate the case at home and that neither a computer nor printer would be provided in the jury room.  The court encouraged the jurors to discuss the evidence together and to use a board in the jury room for outlining their points.  The court explained: "This is a different process than maybe what you do when you're at work or if you're at school.... This is a deliberative process.  Part of what the benefit of the jury is ... you have 12 people sharing their ideas about ... the evidence they heard and how the law would apply to the evidence.... [¶] [I]f we could put all the facts in a computer and deliver an answer, we wouldn't need a jury.  But that's not the process we engage in here.  This is a process of ... give and take where people talk to each other.  They don't forego their opinions about the evidence but they listen to other people's opinions and they evaluate things in that fashion.  [¶] ... [I]t's different than a purely quantitative evaluation of everything.  People are human beings.  The jury is 12 human beings, thinking and talking about the evidence together.  It's not such a mathematical process."

11

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Following the court's explanation and the playing of the audiotape evidence, the jury resumed deliberations for only a few minutes before presenting another note.  The note, written at Juror No. 9's request, asked for a definition of the word "abiding" and asked "is it possible for someone to come or stay to review the evidence on their own" apart from the other jurors.  The court responded that individual review of the evidence when the jury was not assembled was not possible, and that no further definition of "abiding" would be provided apart from the instructions previously given.  The jury then resumed deliberations for about two hours before the end of the day.

The next morning, Thursday March 17, the jury foreperson sent a note to the court asking if the jurors could have extra copies of the instructions and take the instructions home.  The foreperson also stated that "[o]ne juror is not comfortable with [the] process[,] causing others to feel they cannot proceed" and asked "[w]hat is the process of using an alternate when a juror is causing conflict with [the] group?"  The court provided each juror with a copy of the instructions, to be kept at court, and questioned the foreperson about the concerns expressed in the note concerning the deliberative process.  The foreperson said a "particular juror," later identified as Juror No. 9, had questions about many words in the jury instructions and was "not open to discussion of the words or the definitions" but wants "to have formalized questions continuously submitted to the court" for further definition rather than looking "inside the instructions for definitions" or using "the common definition" of the word.  The foreperson reported that Juror No. 9 was not comfortable with the jury instructions, "the process of coming to a conclusion, of analyzing circumstantial versus direct evidence" and that, as a result, other jurors felt that deliberations were not "a working process" and were experiencing "spiked emotions."  Out of the jury's presence, the court expressed to counsel its concern that Juror No. 9 was not "understanding the law."  The court recalled the foreperson and asked him if "the dynamics of the deliberations" might change if additional words were defined or if the jury was advised by the court that certain words could not be further defined.  The foreperson said it was possible but explained that Juror No. 9 was rereading "every single instruction" and struggling over many terms, including the meaning of "intent."  The court remarked privately to counsel that it questioned if one is capable of serving on a jury if one "can't understand and apply the term 'intent.'"

The court, with counsels' consent, questioned Juror No. 9 to see if he was capable of proceeding.  The court cautioned the juror not to disclose the substance of the deliberations and focused on whether the jury had everything it needed to deliberate.  The court noted that the jurors had been given all trial exhibits for review and individual copies of the jury instructions and asked Juror No. 9 if he had "everything you need to deliberate" and discuss the charges with the other jurors.  Juror No. 9 said he was "not at that stage yet." The juror said he was not ready to deliberate because he needed more time to study his notes and the jury instructions.  The court asked Juror No. 9 if he would be ready to deliberate after further review of the jury instructions and he said "probably."  The court asked if there were any words in the jury instruction that the juror felt were not sufficiently defined, and the juror said the problem with relying on the plain meaning of English words was that "everybody may not have the same understanding of the English words or interpretation" and "different people have different perceptions."  The court said "that's part of the jury process," and Juror No. 9 said "it's not right, because the instruction about the law should come from the court" and wanted the jury to submit questions to the court when there were differing interpretations.  The court asked if Juror No. 9 had been the one

12

to request to stay late to review the evidence and he said that he had because he "was slow in reading English." Juror No. 9 was born abroad but had lived in the United States for "many years" and had a Ph.D. degree in physical chemistry from an American university. He said he had "taken a criminal law class" and had heard the terms contained in the jury instructions but found it "complicated" and wondered "for people who did not take such a class, how can they possibly understand instructions so quickly?" As an accommodation, the court offered to send the rest of the jurors home early and let Juror No. 9 stay to review his notes and the jury instructions that day and the following days when the jury was not scheduled to deliberate. Juror No. 9 accepted and said he "believed" he would be prepared to deliberate after doing so. The juror spent nine hours over several days alone in the jury room reviewing his notes and the jury instructions.

Deliberations resumed on the afternoon of Monday March 21 and continued through Wednesday March 23. On the morning of March 24, the foreperson sent a note to the court stating, "We the jury have not been able to reach a unanimous consensus on any of the charges at this time. [¶] It is the opinion of several jurors that one juror is having challenges with the concepts of 'reasonable.' One juror, in particular, continues to discuss ideas from his personal experiences that were not presented in this case as evidence nor are they relevant to the case before us. [¶] This has caused conflict within the group of jurors and elevated tempers to the point that the group will not be able to reach agreement on the charges before us. [¶] At this time we would either require an alternate juror or move towards a hung jury verdict."

Juror No. 9 wrote a reply note saying he disagreed with the foreperson's statement and thought deliberations should continue. Juror No. 9 said "[t]he jury instruction calls for us to rely on common sense and experience. Relying in part on my experience in life, I feel that on the basis of the evidence as presented ... I do not believe that the prosecution has sufficiently proven the allegations to allow me to form an abiding conviction about the guilt alleged."

The court called the jury into the courtroom. The court first addressed the foreperson's note about the inability to reach consensus. The foreperson said the jury had discussions and preliminary votes on six of the seven charges and had cast ballots on a couple charges. The vote on the last ballot was 11 to 1. The court asked the foreperson, then Juror No. 9, if there was any legal clarification the court could provide to assist the jury in reaching a verdict. Juror No. 9 said "I don't know what to ask for except for understanding of the Constitution or the jury instruction, because people have different interpretations." The court asked if he had a specific question and, after further exchange, Juror No. 9 noted that the juror questionnaire said a juror "must follow the law regardless whether you believe in it or not. And, I mean, at that time I hesitated and but then I—there is something I don't agree with, I mean, then why does [the] Constitution require us to follow something we don't believe in? [¶] So this may be a question in everybody's mind, and it's so—so why is the standard set so high that defendant is—should be presumed innocent? And why can't we apply the lower standard of proof such as preponderance of the evidence?" The court asked Juror No. 9 to write a note with his legal questions so court and counsel could confer about a possible response, and declared a long lunch recess.

Juror No. 9 wrote five pages of questions. The numerous questions included the following: "Why is there a difference in the standard of proof between civil trials and

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

criminal law?"; "Does it make sense that a defendant may be found not guilty in a criminal trial, but guilty in a civil trial (based on the same facts)?"; When I have reasonable doubt, how do I tell that my doubt has risen only to the level of preponderance of the evidence, but has not reached the level of beyond a reasonable doubt (for sure?)"; "Why must we pledge that we must follow the law even when the law is itself in dispute in court?"; "Why must a defendant be presumed innocent?"; "Why is defense not required to present any evidence, or to call any witness?"; "Does the fact that an evidence has been admitted by the court into evidence mean that the court has determined that the evidence is reliable?"; "When a witness gives contradictory testimony, I am at a loss as to how to determine, objectively, which testimony I should believe"; "What constitutes juror misconduct requiring disqualification, mistrial, or new trial?"; "What if a juror suddenly realizes that the juror can no longer be impartial?"

The court conferred with counsel.  The prosecutor questioned the juror's "readiness" to serve as a juror and said Juror No. 9's note posed many questions that were of "a broad ranging nature" "far beyond the purview of a juror."  Defense counsel objected to removing Juror No. 9 from the jury but said the court should not "endeavor to answer the questions" because the "contents of the questions divulge" the "deliberative process of the jury."  The court expressed doubts that Juror No. 9 was following the law and decided to examine him further.

Juror No. 9 said that some of the questions he posed referred to other jurors, not himself, including the question asking what happens if a juror "can no longer be impartial." Outside of the jurors' presence, defense counsel argued that Juror No. 9's note was "essentially describing the deliberative process" and that no further inquiry or action was necessary.  The prosecutor disagreed, arguing that the juror's written questions went "far beyond what was put to him by the court this morning" and demonstrate that Juror No. 9's mind was ranging beyond "the issues placed before the jury in this trial."

The court concluded that Juror No. 9 was not following the law.  The court found that Juror No. 9 was "considering things that he's been told not to consider," asking, for example, why the defense is not required to present any evidence or call any witnesses. The court observed that, from the outset of trial, "the court has admonished the jurors that that's the constitutional protection that the defendant is entitled to, and the fact that he's raising that after four days of deliberation indicates to the court that he's not following the law."  The court also noted that Juror No. 9 questioned why a defendant is presumed innocent, despite clear instructions to that effect, and is "considering why there's a different standard of proof in civil versus criminal" trials.  The court said Juror No. 9 was not "following the law that the court has instructed him on or following the court's directions as to what he's supposed to deal with here.... [¶] ... [H]e's clearly getting way beyond the scope" and "engages in flights of legal fancy," "speculating on things that are far beyond the record."  The court also noted that Juror No. 9 expressed an inability to judge credibility in writing in his note that he was "at a loss as to how to determine" which testimony to believe.  The court found Juror No. 9 "incapable of executing his obligations as a juror in a fair and impartial manner," removed him from the jury and seated an alternate juror in his place.

Jury deliberations began anew on the afternoon of Thursday March 24.  The jury deliberated for the rest of that day and recessed until Monday, March 28.  The jury reached

14

1    a verdict on the afternoon of March 28.  The jury found defendant guilty of five counts and
     not guilty of two counts.

2    Ex. 12 at 9-16.  The Court of Appeal determined that the trial court's conclusion that Juror

3    Number 9 was not following the law was well supported by the record and therefore that there was

4    good cause for discharging him.  Id. at 17-18.

5         The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of

6    impartial jurors.  U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961); Green v.

7    White, 232 F.3d 671, 676 (9th Cir. 2000).  Due process requires that the defendant be tried by "a

8    jury capable and willing to decide the case solely on the evidence before it."  Smith v. Phillips,

9    455 U.S. 209, 217 (1982).  See also United States v. Plache, 913 F.2d 1375, 1377-78 (9th Cir.

10   1990).  An impartial jury consists of "jurors who will conscientiously apply the law and find the

11   facts."  Wainwright v. Witt, 469 U.S. 412, 423 (1985).  A criminal defendant does not have the

12   right to be tried by a juror who has "explicitly indicated an inability to follow the law and

13   instructions of the trial judge."  Lockett v. Ohio, 438 U.S. 586, 596-97 (1978).

14        California Penal Code section 1089 provides for the substitution of jurors as follows:

15        If at any time, whether before or after the final submission of the case to the jury, a
          juror dies or becomes ill, or upon other good cause shown to the court is found to be
16        unable to perform his or her duty, or if a juror requests a discharge and good cause
          appears therefor, the court may order the juror to be discharged and draw the name of
17        an alternate, who shall then take a place in the jury box, and be subject to the same
          rules and regulations as though the alternate juror had been selected as one of the
18        original jurors.

19   The juror substitution procedure outlined in Section 1089 of the state penal code protects a

20   criminal defendant's constitutional right to an impartial jury, which is guaranteed by the Sixth

21   Amendment.  Bell v. Uribe, 748 F.3d 857, 867-68 (9th Cir. 2013); Perez v. Marshall, 119 F.3d

22   1422, 1426 (9th Cir. 1997); Miller v. Stagner, 757 F.2d 988, 995 (9th Cir. 1985).  Because a

23   criminal defendant's rights under the Sixth Amendment are intertwined with his rights under

24   Section 1089, a state court's ruling that a juror was properly removed is an adjudication of his

25   federal claims and is entitled to AEDPA deference. Johnson v. Williams, 133 S. Ct. 1088, 1091-92

26   (2013); Bell v. Uribe, 748 F.3d at 864.  A trial court's finding that good cause exists to remove a

27   juror is a factual finding entitled to deference on habeas review.  Perez v. Marshall, 119 F.3d at

28

United States District Court
Northern District of California

15

1    1426; cf. Patton v. Yount, 467 U.S. 1025, 1036-38 & n.12 (1984) (whether juror can render

2    impartial verdict is question of historical fact entitled to special deference).

3           Applying these legal principles to petitioner's current claim, the state court's rejection of

4    this claim was not contrary to, or an unreasonable application of, clearly established Supreme

5    Court precedent.  A review of the record fully supports the trial court's finding that Juror Number

6    9 was not following the law.  Specifically, he was unable to focus on relevant principles and apply

7    the instructions to the facts before him.  See, e.g., Ex. 3 at 1561 (asking, "why does the

8    Constitution require us to follow something we don't believe?").  He questioned basic principles

9    he was instructed to accept such as the presumption of innocence and the right of a criminal

10   defendant not to present evidence.  See, e.g., Ex. 3 at 1561-62 (asking why the standard was set so

11   high that defendant is presumed innocent and why the jury could not accept a lower standard of

12   proof such as preponderance of the evidence); Ex. 2 at 730 (asking, "why is defense not required

13   to present any evidence, or to call any witness").  He also went beyond the issues relevant to the

14   case and considered matters outside the record.  See, e.g., Ex. 3 at 1570-71 (referring to disputes in

15   the law between the Ninth Circuit, the Supreme Court, and California courts).

16          Petitioner further claims that the trial court erred by inquiring into the jury's numerical

17   division.  Dkt. #3-2 at 69.  A trial court's knowledge that the removed juror was the sole holdout

18   does not invalidate the decision to excuse the juror from jury service.  Bell v. Uribe, 748 F.3d at

19   868; Perez v. Marshall, 119 F.3d at 1427.  Here, the California Court of Appeal noted that

20   "Despite the court's admonitions not to disclose his deliberative process, Juror No. 9 revealed in a

21   note to the court that he did not believe 'that the prosecution has sufficiently proven the allegations

22   to allow me to form an abiding conviction about the guilt alleged.'"  Ex. 12 at 16 n.7; Ex. 2 at 724.

23   In this case, as in Bell, the trial court "took great pains to preserve the originally empaneled jury."

24   748 F.3d at 868.  The trial court spent several days responding to Juror Number 9's questions and

25   asking him if he had everything he needed to deliberate.  Juror Number 9 was given nine hours

26   over several days to review the instructions alone in the jury room.  The state court reasonably

27   determined that the trial court removed Juror Number 9 because he was unable to follow the law

28   and not because he was the sole holdout juror.  See Ex. 12 at 16 n.7 (Court of Appeal opinion

United States District Court
Northern District of California

United States District Court
Northern District of California

1    noting that "[t]he [trial] court later learned that the numerical division of the deadlocked jury was

2    11 to 1" and "[c]ontrary to [petitioner's] claim, the [trial] court did not err by inquiring into the

3    jury's numerical division.")

4            Finally, petitioner claims the trial court abused its discretion by failing to inquire into

5    alleged misconduct by other jurors.  Dkt. #3-2 at 71-72.  The Court of Appeal summarized and

6    rejected this claim as follows:

7        [Petitioner] argues that the trial court erred in limiting its investigation to Juror No. 9
         without inquiring into possible misconduct by other jurors.  [Petitioner] contends that
8        evidence of misconduct was embedded in Juror No. 9's five pages of questions, and in
         the question "What if a juror suddenly realizes that the juror can no longer be
9        impartial?" which he said referred to "other persons."  As our high court has observed,
         "A trial court made aware of the possibility of a juror's misconduct, and particularly
10       possible misconduct occurring during the jury's deliberations, is placed on a course
         that is fraught with the risk of reversible error at each fork in the road.  [Citations.]
11       The court must first decide whether the information before the court warrants any
         investigation into the matter.  [Citation.]  If some inquiry is called for, the trial court
12       must take care not to conduct an investigation that is too cursory [citation], but the
         court also must not intrude too deeply into the jury's deliberative process in order to
13       avoid invading the sanctity of the deliberations or creating a coercive effect on those
         deliberations [citation].  After having completed an adequate (but not overly invasive)
14       inquiry into the misconduct issue, the trial court must then decide whether, under
         section 1089, there is 'good cause' to excuse the juror at issue.  The court at this final
15       fork might err in declining to dismiss a juror who should have been excused [citation]
         or excusing a juror who should have been retained [citation].  In making these
16       decisions, a trial court might at times be placed between a rock and a hard place."
         (*People v. Fuiava* (2012) 53 Cal.4th 622, 710–711, fn. omitted.)
17

18       The trial court here navigated this difficult course well and did not abuse its discretion
19       by limiting its investigation to Juror No. 9.  The information provided by Juror No. 9
         did not warrant inquiry into the conduct of the other jurors.  His general question
20       about juror impartiality indicated, at most, that he believed other jurors were not
         impartial.  Such feelings are not uncommon during heated deliberations and here the
21       juror provided no reason to believe other jurors were not impartial.  The expression of
         such a sentiment without any evidence of juror bias does not compel further
22       investigation.  Nor was investigation of other jurors compelled by the suggestion that
         evidentiary issues like the reliability of admitted evidence and the burden of proof
23       were "raised" during discussions among the jurors.  These matters were proper
         subjects of jury deliberation.  There is no evidence that the other jurors were not
24       following the law on these subjects.  The court acted properly here in limiting the
         scope of its inquiry and not delving into the content of the jury's deliberations.  A trial
25       court must take care "to avoid intruding unnecessarily upon the sanctity of the jury's
26       deliberations." (*People v. Thompson* (2010) 49 Cal.4th 79, 137.)
27

28   Ex. 12 at 18-19.

17

1     The Supreme Court has not clearly established that a trial court is required to hold a

2     hearing whenever evidence of potential juror bias comes to light. <u>Sims v. Rowland</u>, 414 F.3d

3     1148, 1153 (9th Cir. 2005); <u>accord</u> <u>Grotemeyer v. Hickman</u>, 393 F.3d 871, 880-881 (9th Cir.

4     2004); <u>Tracey v. Palmateer</u>, 341 F.3d 1037, 1044 (9th Cir. 2003).  The Ninth Circuit has indicated

5     that the trial court retains flexibility in determining what steps to take in response to an allegation

6     of juror bias. <u>Tracey</u>, 341 F.3d at 1044.

7     Petitioner contends that the trial court should have asked, after receiving the foreperson's

8     note stating "It is the opinion of several jurors that one juror is having challenges with the

9     concepts of 'reasonable,'" whether the  note was based on the jurors' deliberations or

10    on improper individual discussions amongst jurors who were meeting separately.  Dkt. #3-2 at 71-

11    72.  The note continues, however: "This has caused conflict within the group of jurors and

12    elevated tempers to the point that the group will not be able to reach agreement on the charges

13    before us." Ex. 2 at 725.  The foreperson's note, read as a whole, does not indicate that the

14    foreperson's observations were made pursuant to improper individual discussions.

15    Petitioner also contends that because Juror Number 9 told the trial court that some of the

16    questions in his five-page list of questions referred to other jurors, the trial court should have

17    investigated other members of the jury.  Dkt. #3-2 at 72.  Juror Number 9 suggested in his list of

18    questions and in a discussion with the trial court that he believed other jurors could not be

19    impartial.  Ex. 2 at 734; Ex. 3 at 1569.  When asked to elaborate, however, he clarified "two jurors

20    were pretty upset" and acknowledged that they were upset about him specifically.  Ex. 3 at 1570.

21    He also stated, "I sense people have doubts." Ex. 3 at 1570.  A review of the record supports the

22    appellate court's determination that the trial court reasonably decided not to investigate Juror

23    Number 9's perceptions of other jurors.  An investigation would have delved into the deliberative

24    process, and Juror Number 9's perceptions were not in themselves evidence of misconduct and

25    were not supported by any other juror.

26    Accordingly, petitioner is not entitled to habeas relief on this claim.

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

C.      Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## IV.  CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall terminate all pending motions, enter judgment in favor of respondent, and close the file.

Additionally, the Clerk is directed to substitute Eric Arnold on the docket as the respondent in this action.

**IT IS SO ORDERED.**

Dated:  June 30, 2015

_____
JON S. TIGAR
United States District Judge